Filed 11/13/25  P. v. Garcia CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085870 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF2101512) |
| FRANCISCO JAVIER RIVAS GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside, Frederick Paul Dickerson, III, Judge.  Affirmed.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Supervising Deputy Attorneys General and Sahar Karimi, Deputy Attorney General for Plaintiff and Respondent.

A jury convicted Francisco Javier Rivas Garcia of rape of a child under age 14 and more than seven years younger than the defendant (Pen. Code, § 269, subd. (a)(1); count 1). The court declared a mistrial on two other sex offense counts,[1] and dismissed them. It sentenced defendant to 15 years to life in prison. Defendant contends the court prejudicially erred by allowing his character witnesses to be impeached with evidence—adult relationships or affairs—that went beyond the scope of direct examination, and was not related to a particular incident or character trait that he had offered on his own behalf. He argues that if we conclude his counsel did not adequately object to the evidence, he received constitutionally ineffective assistance. Defendant further contends the court erred by admitting irrelevant evidence related to child sexual abuse accommodation syndrome (CSAAS), violating his Fourteenth Amendment right to due process. Again, defendant argues he received constitutionally ineffective assistance in the event we conclude his counsel did not preserve evidentiary objections for appeal. Defendant finally contends the court prejudicially erred by instructing the jury with CALCRIM No. 1193, which permitted the jury to use the CSAAS testimony as evidence of his guilt, and reduced the prosecution's burden of proof in violation of his rights to due process and a fair trial. We reject the contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Because defendant does not challenge the sufficiency of the evidence of his convictions, we need not recount his actions in depth. For purposes of the issues on appeal, it suffices to briefly summarize the incidents, in which

---

[1] Those counts were of sexual penetration on a child under age 14 and more than 10 years younger than defendant (Pen. Code, § 289, subd. (j); count 2) and committing a lewd act on a child (Pen. Code, § 288, subd. (a); count 3). The jurors were deadlocked on those charges.

2

defendant inappropriately touched his wife's niece G.M., and on one occasion raped her. Specifically, on an occasion when G.M. was around 11 or 12 years old, she was riding in a truck with defendant and other family members when defendant digitally penetrated her. At that time, she and defendant were covered by a blanket and everyone was asleep but the driver. G.M. testified that on another occasion, defendant came into the kitchen where she was located, pulled down her pants and pressed his genitals against her bare skin. As to the rape incident, G.M. testified that defendant came into a bedroom where she was alone, lifted his finger to his mouth so as to tell her not to say anything, took off her pants and underwear, and penetrated her. The next day, defendant gave G.M. two hundred dollars to keep her silent. G.M. denied being physically attracted to defendant.

When G.M. was about 14 or 15 years old, she told a church youth group leader that defendant had been molesting her. Though the individual told G.M. she should talk to her mother and the authorities, G.M. expressed she did not want to out of fear it would ruin her relationship with her aunt. Years later in 2020, when G.M. was in her late 20s, she finally reported the incidents to police. G.M. was 30 years old at the time of trial.

At trial, the prosecution played for the jury a 2020 interview of defendant by an officer from the Riverside County Sheriff's Office, who was assisted by a translator. Defense counsel stipulated to admit the entire transcript into evidence. During the interview, defendant claimed that when G.M. was 12 to 14 years old, she was interested in him and on one occasion opened her robe to him so he could see her unclothed, but that he always rejected her advances. He claimed G.M. was interested in his sexual activity and relationships with other women, which G.M. learned about from her father.

3

The investigator said to defendant that it sounded like G.M. "wanted something" with him, to which he responded that G.M. wanted money, and that it was "very stuck in her head why did I have a girlfriend, how lucky I was, and all that." The investigator asked: "So that was true, that you had several girlfriends? Defendant responded: "I had . . . I did have . . . a lov—. Well, two lovers, right there where I . . . where I lied [*sic*]."[2] Defendant said G.M.'s father knew about his girlfriends.

Defendant claimed that G.M. had a "bad habit" of asking him to rub her back, which annoyed him, and gave an example of an incident where they were in a car with one of his brothers driving. When asked if he penetrated G.M. in the car under a blanket, he denied it as "impossible," saying, "How could anyone do that, especially when there are [two] people in the front and three of us in the back?" Defendant said that on another occasion, G.M. invited him into her room, where she jumped up from her bed and hugged

---

[2] We asked the parties for supplemental briefing on whether the word "lied" in this part of the interview transcript was a translation or transcription error. The parties agree that the word should have been translated as "lived." Defendant asks us to take judicial notice of a declaration from the interpreter who translated his interview as well as a dictionary translation of the word "vivir" under Evidence Code section 452, subdivision (h), permitting judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." The People concede that judicial notice is appropriate, but argue defendant invited the error, which is not prejudicial in any event based on all the evidence. As we point out below, the prosecutor briefly referenced that portion of defendant's interview in her closing argument, asking the jury to consider it "when you're looking at who to believe." Even if we were to take judicial notice of the correct translation, our outcome would not change. The jury believed G.M.'s testimony concerning the rape incident, and by its inability to reach verdicts on the other charges did not appear to be unfavorably influenced against defendant by the infidelity evidence. The transcription error, in our view, is harmless under any standard.

and kissed him, surprising him. Defendant thought G.M. wanted to "get [him] in bed" and he claimed that was when she said he raped her. He told the officer: "How could I rape her? If that were the case, anyone would have claimed stuff, 'Look, if I was raped, then I—I was violated.' Right? . . . [¶] . . . [¶] . . . Wow. She never said anything about anything, till much later when she started all this stuff."

The prosecution presented clinical and forensic psychologist Jody Ward to discuss CSAAS. Dr. Ward explained that CSAAS was not a tool to diagnose or determine whether or not sexual abuse occurred, but a pattern of behaviors that many sexually-abused children exhibit. She explained that unlike children abused by a stranger, children abused within an ongoing relationship do not report the abuse right away out of love and loyalty toward the abuser, and when they do report it, many times they are not believed. Dr. Ward testified that CSAAS has five components: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed/unconvincing disclosure; and (5) retraction or recantation.

The secrecy component reflects that sexual abuse occurs in secret, without anyone there to witness it and stop it from happening, and children keep sexual abuse secret for very long periods of time without typical threats, or out of embarrassment. The phenomenon permits the perpetrator to take seemingly brazen risks, like committing the abuse under a blanket with other family members present. Dr. Ward testified that "very few children report [sexual abuse] at all."

Helplessness refers to the power imbalance between the physically larger adult and child, who does not tend to fight back. She explained that children are dependent and reliant on adults for their emotional and basic physical needs, including food, clothing, and shelter, thus fall prey to abuse

easily.  The child may disassociate or put themselves in positions to be abused repeatedly.

Because of secrecy and the child's helplessness, the perpetrator is able to continue the sexual abuse, resulting in entrapment and accommodation. Dr. Ward testified that children cannot escape, become entrapped, and accommodate the abuse in other ways, acquiescing believing they must put up with it to obtain positive things from the relationship or keep the family together.  She explained that things were different for a child with love and care for the perpetrator, whereas someone on the outside would do anything to get out of the situation.  Dr. Ward considered a child to be anyone under age 18.

Dr. Ward described delayed disclosure as "the most widely researched aspect of [CSAAS]."  She explained that research shows that of the children who report sexual abuse, two-thirds of them wait until adulthood; only one-third report when they are under age 18.  Those who do disclose tend not to report every detail the first time.  They tend to test the other person's response, then share more as they become more comfortable.  If the other person does not want to hear details or does not pick up on what is happening, the child is much less likely to report abuse in the future.

As for the final component of recantation and retraction, Dr. Ward explained that once a disclosure is made and the consequences begin (such as intrusive police interviews or physical exams, and the perpetrator facing serious charges) some children "may backpedal on their allegations" to soften the consequences.  In a minority of cases, the child may "recant or take back all sexual abuse allegations altogether."

Dr. Ward testified she had not reviewed anything about the particulars of defendant's case; her testimony was of CSAAS generally based on her research.

During defense counsel's questioning of G.M., he emphasized the passage of "15, 20 years" during which time, as he put it, G.M. "decided that sitting on the lap, for example, was sexual in nature . . . ." He asked G.M. to confirm that when she first spoke to her family about what happened, she did not mention the car ride. He made a point to have G.M. count and agree that there were about seven family members in the truck when the inappropriate touching occurred. He asked G.M., "Not one family member has ever said to you that they saw [defendant] be inappropriate with you" and "[n]obody ever came to you and said, '. . . I see the way that he's holding you on his lap. Are you okay?" He asked whether "many people would be around while you're saying this lap-sitting stuff that was sexual in nature occurred . . . ." He had G.M. confirm that the first time she said anything about the kitchen incident was at defendant's 2022 preliminary hearing. Defense counsel also asked questions of defendant's daughter so as to confirm G.M. had been at family gatherings both when G.M. was younger and between 2009 and 2020 where defendant was present and that G.M. had acted normally; she never saw G.M. be afraid of defendant at those gatherings or in other settings. In response to defense counsel's questions, G.M. admitted that a child protective services worker had interviewed her shortly after the truck, kitchen and rape incident had happened, but she denied any sexual abuse. He asked the following questions:

"[Defense counsel]: And you also knew that if something—if you had told them that something was happening, that they would be there to protect you; right?

7

"[G.M.]: Correct.

"[Defense counsel]: And then four years later—after, by your own statement, in your story, there was no touching by [defendant] for a four-year period of time—that's the first time that you ever said anything, when you talked to [the church youth group leader]?

"[G.M.]: Correct.

"[Defense counsel]: And then that period of time where then you talked to [your cousin, A.R.] and you talked to [your aunt, G.R.] and—and you had the meetings, never mentioned anything again until 2020?

"[G.M.]: Correct."

## DISCUSSION

### I. *Admission of Impeachment Evidence*

Defendant contends the trial court prejudicially erred when it permitted improper impeachment of his character witnesses. He concedes that broad rebuttal evidence is warranted where direct testimony paints an overall broad picture of an honest, well-behaved person incompatible with a violent character. But he argues that the scope of rebuttal evidence of bad character must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait he offers in his own behalf. According to defendant, the prosecutor violated this rule by cross-examining his daughter and wife about irrelevant and prejudicial matters, namely his adult extramarital relationships, that went beyond the character traits those witnesses described.

### A. *Background*

Before trial, the court granted defendant's motion to introduce lay opinion character evidence of nondeviant sexual behavior to show the charged acts did not occur. It deferred ruling on whether the prosecutor in

8

response could ask impeaching questions about whether certain things would change those witness's opinions, stating it depended on the breadth of the questions posed.

At trial, defendant presented evidence from his wife and several of his children, including his daughter, A.R. A.R. testified she had not seen any of her cousins sitting in defendant's lap, or G.M. express any discontent or fear around him. She stated she would not describe defendant "as being . . . touchy-feely [or] huggy, lots of that kind of activity." When asked how defendant was "with respect to overall physical contact, from [her] observations," A.R responded: "Just didn't happen. I mean, he wasn't that type of person." A.R. did not hear defendant make statements of an inappropriate or sexual nature to G.M. At around the time she was in middle school, G.M. never told A.R. that defendant made her uncomfortable, and A.R. never saw G.M. pull away from him. A.R. never saw defendant tickling G.M. or G.M. emotionally distraught during that time.

Following A.R.'s testimony, the court ruled that A.R.'s statement that defendant was "not that type of person" opened the door for the prosecutor to ask guilt-assuming hypothetical questions as well as "ask about any character evidence."[3]

On cross-examination, the prosecutor asked A.R. if she was close to her father. She responded that she "always respected my dad" and still did so.

_____

[3] A.R. went on to testify that some years later, G.M. asked to speak with her, and told her something bad had happened with defendant, but did not specify what it was. A.R. was shocked and did not know what to say, as she never heard anyone speak negatively about her father. A few days later, A.R. asked G.M. whether the matter was something they needed to go to police about, but G.M. did not respond. A.R. then spoke to her mother, who eventually met with G.M. A.R. testified there were family gatherings and events between 2009 and 2020 where G.M. and defendant were present, but she saw no odd, unusual or awkward interactions between them.

She testified she had seen parts of her father's interview with detectives. A.R. reiterated that she would never see G.M. on her father's lap, and she herself did not sit on his lap, because "[h]e wasn't that type of person." When asked if she had told an investigator that her father was a liar, A.R. said she did not recall saying that. A.R. was then asked: "Were you aware that your dad had other women in his life, other than your mother?" She said no, and in response to questioning, testified it would be surprising to her if she learned he had other lovers in his life. Over counsel's objections, A.R. testified it would surprise her if she learned defendant would "tell [G.M.] about these things." She was asked: "Would that change your opinion of your dad if you learned those things?" A.R. responded, "Yes, it would." In response to questions on further redirect and re-cross examination, A.R. testified she had never seen defendant acting in any way that told her he had a sexual interest in children, but agreed that if she learned that he did sexual things with a minor, it would change her opinion.

Before presenting defendant's wife, G.R., as a witness, defense counsel revisited the issue of character evidence with the court. He pointed out that because defendant did not testify his character was not at issue, and counsel acknowledged he could not "go into whether or not he's a violent or peaceful person" or "whether or not he is an honest or truthful person because he has not taken the stand to have his credibility attacked." But, counsel posited that under *People v. McAlpin* (1991) 53 Cal.3d 1289, he could "ask witnesses about whether or not [defendant] has a reputation or there's an opinion about him having, or not having, a deviant character, as far as his sexual interest in minors." Counsel complained that he was foreclosed from challenging G.M.'s credibility and demeanor, while the court had permitted the prosecution to ask questions about defendant's negative character, as well as

10

guilt-assuming hypotheticals. He sought to confirm with the court that he could ask G.R. "*McAlpin*-type character evidence" without being faced with cross-examination about honesty and veracity. The court allowed him to do so, but emphasized that permissible cross-examination would depend on the witness's answers.

G.R. then testified that she never saw inappropriate interactions between defendant and G.M.; she did not see G.M. sit in his lap, defendant tickle G.M., or defendant act in any "creepy way" toward G.M. When asked how she could be sure, she testified: "Because, in my opinion, he's not the kind of person that does those type of things. And, also, his reputation speaks for itself. He's the type of person that . . . that doesn't show the type of things that [G.M. is] saying that he did." G.R. testified that in their 43 years together, she never saw defendant "act in a sexually inappropriate way around children."

Thereafter, outside the jury's presence, the prosecutor argued that G.R.'s testimony had opened the door to cross-examination about her "knowledge of [defendant's] sexual proclivities and interests . . . ." The court ruled: "[T]here was no door that was opened regarding veracity or honesty. And I don't think it would be relevant as to his adult relationships, like the affairs. [¶] But what you can do, . . . you can ask her about the alleged charges. You can ask about anything regarding kids, because that's what she—that's what she was testifying to, and so that does open the door. But as far as do you think he's an honest guy? That wasn't a part of the subject. The adult relationships, in the opinion of the court, they're irrelevant for purposes of the cross-examination because this case involves children." The court allowed the prosecutor to ask G.R. whether she knew " 'if [defendant] had any other physical relationships with females that were minors.' "

11

On cross-examination, the prosecutor asked G.R. if she knew if her husband had any sexual contact with minors other than a family member, and G.R. responded no. The prosecutor asked: "Do you know the ages of the other women he would spend time with?" The court sustained defense counsel's objection to the question on speculation grounds. The prosecutor then turned to defendant's telephone interview with law enforcement, and G.R. confirmed she was not with him when that took place; she testified that defendant at that time was in Sacramento by himself where he was working at his job, and told her about the call after he had returned. Counsel then asked: "Is it fair to say you don't know what he would do on these business trips he went on?" Over counsel's objection, G.R. was permitted to answer: "Yes, of course. I know that he was working, and besides he would show his check." The prosecutor went on:

"[Prosecutor]: But he had to show his check to you to prove he was working?

"[Defense counsel]: Objection. Argumentative.

"The court: Sustained.

"[Prosecutor]: Why would he show you his check?

"[Defense counsel]: Objection. [Evidence Code sections] 350 and 352 and beyond scope.

"The court: I'm going to sustain the objection on [Evidence Code section] 352 grounds.

"[Prosecutor]: So are you telling us that, when your husband was away in other cities on work, you knew exactly what he was doing the whole time?

"[Defense counsel]: Objection. Argumentative. Misstates testimony.

"The court: Overruled.

"[G.R.]: Yes, of course. I knew he was working."

12

B. *Legal Principles and Standard of Review*

In general, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101.) But there is an exception: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible . . . if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait . . . ." (Evid. Code, § 1102; see *People v. Hawara* (2021) 61 Cal.App.5th 704, 712-713.) In *People v. McAlpin*, the court explained: "This exception allows a criminal defendant to introduce evidence, either by opinion or reputation, of his character or a trait of his character that is 'relevant to the charge made against him.' [Citation.] Such evidence is relevant if it is inconsistent with the offense charged—e.g., honesty, when the charge is theft—and hence may support an inference that the defendant is unlikely to have committed the offense. In appropriate cases, such circumstantial [character] evidence 'may be enough to raise a reasonable doubt in the mind of the trier of fact concerning the defendant's guilt.' " (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1305.)

*McAlpin* involved a claim of lewd conduct with a child under age 14. (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1294.) Applying the above-referenced Evidence Code section 1102 exception, *McAlpin* held that courts can permit lay opinion testimony to establish a defendant's character for not being sexually deviant—that is, a person engaging in lewd conduct with children—if the opinion is inconsistent with the charged offense and based on the witness's personal observation. (*Id*. at pp. 1306-1307, 1309.) When such

13

testimony is elicited, the prosecution must be permitted to cross-examine those witnesses to test the validity of their opinion or the weight to be given to it by asking whether the witness "has knowledge of events or acts which have indisputably occurred" even if the witness has no knowledge of them. (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 954; see also *People v. Hawara*, *supra*, 61 Cal.App.5th at p. 713 ["Once a witness testifies, on direct examination, to the defendant's good character, it is a common and accepted method of cross-examination to ask whether the witness is aware of instances of the defendant's bad character. A variant of this is to ask . . . whether the witness's opinion would change if the witness became aware of instances of the defendant's bad character"].) "[W]hen the witness has testified to the defendant's *reputation*, based on what the witness has heard, the proper form is to ask, 'if you heard.' However, when the witness has testified to the witness's own *opinion*, based on the witness's perceptions, it is perfectly proper to ask, 'if you knew.' [Citation.] In each instance, the cross-examination question is tailored to undermining the claimed basis for the witness's testimony." (*Hawara*, at p. 713.) "If allowing these questions and answers would create a substantial danger of undue prejudice to the defendant, the trial judge has the discretion to preclude them under Evidence Code section 352." (*Hempstead, supra*, 148 Cal.App.3d at p. 954.)

We review the court's evidentiary rulings under Evidence Code section 352 for abuse of discretion. (*People v. Dworak* (2021) 11 Cal.5th 881, 899-900; *People v. Morales* (2020) 10 Cal.5th 76, 97; *People v. Flores* (2024) 101 Cal.App.5th 438, 449.) Under that standard, we will not disturb the trial court's ruling unless it falls outside the bounds of reason; an abuse of discretion can be established if the court exercised its discretion " ' " 'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest

14

miscarriage of justice.' " ' " (*People v. Miracle* (2018) 6 Cal.5th 318, 346-347; *Flores*, at p. 449; see also Evid. Code, § 353.)

C. *Analysis*

Defendant's claim of evidentiary error is limited. As to A.R., he challenges only the prosecutor's questioning concerning her knowledge of his having "other women" or "other lovers" in his life. With respect to G.R., he points out that the court's ruling limiting G.R.'s cross-examination should have applied also to A.R.[4] Defendant complains that G.R.'s questioning "suggested [his] infidelity" though the court had limited her questioning to child relationships. Defendant does not challenge the prosecutor's questioning as it related to defendant telling G.M. about "these things."

Because his counsel did not object to the challenged questions to A.R., the claim is forfeited. We address the merits in any event in view of defendant's claim of constitutionally ineffective assistance of counsel. Doing so, we need only focus on prejudice from any assumed error.[5] At the time the prosecution cross-examined A.R., the jury had already heard defendant's recorded admission to the police investigator that he had other girlfriends, or as he put it, "two lovers." Thus, the inflammatory impact of such evidence, if any, stemmed from defendant's own statements to the officer. The question

---

[4] Defendant argues: "If evidence regarding adult relationships was irrelevant for the purpose of cross-examining [G.R.] then it necessarily follows that evidence of adult relationships was also irrelevant for the purpose of cross-examining [A.R.]"

[5] Our prejudice analysis applies to the ineffective assistance of counsel claim. A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland v. Washington* (1981) 466 U.S. 648, 697.)

put to A.R. about her knowledge of defendant having other women or lovers in his life did not introduce any new information to the jury.

Relying on *People v. Jandres* (2014) 226 Cal.App.4th 340 and other cases, defendant contends that given the sharp conflict between his and G.M.'s testimony, as well as the absence of any DNA or physical evidence, "any substantial error tending to discredit the defense, or corroborate the prosecution, must be considered as prejudicial."[6] He argues the case was close in view of the jury's request for the transcript of his police interview as well as G.M.'s testimony, and the evidence against him was not overwhelming given the hung verdicts on counts 2 and 3 involving the truck and kitchen incidents. We do not read the record in such a manner. That the jury hung on two of the counts demonstrates to us that it carefully considered the evidence, and was not negatively influenced by evidence that defendant

---

[6]     We see no relevance of *People v. Jandres*, *supra*, 226 Cal.App.4th 340 to this case. *Jandres* involved the admission of uncharged conduct—the defendant's act of lifting up an 11-year-old girl and putting his finger in her mouth after she screamed—as sexual assault propensity evidence, that is, to prove the defendant committed forcible rape against another, older, victim. (*Id*. at pp. 352-355.) It also involved the prosecutor's erroneous argument that there was "DNA proof" that the defendant put his finger in the girl's mouth. (*Id*. at p. 352.) The Court of Appeal held admission of the evidence was error under Evidence Code section 352: "[T]he pertinent inquiry is whether evidence that defendant exhibited sexual interest in an 11-year-old girl by putting his finger in her mouth rationally supports an inference that defendant is predisposed to rape an 18-year-old woman. Given the many differences between the two offenses—including the circumstances (daytime attempted burglary in one case, possible stalking and attack at night in the other); the ages of the victims (11 and 18); and the nature of the conduct (inappropriate touching of the mouth in one case, rape in the other)—we think not." (*Id*. at p. 356.) It was in that context of error, and particularly the erroneous mention of nonexistent DNA evidence, that the court, in addressing prejudice, made its remark about substantial error tending to discredit the defense. (*Id*. at p. 360.)

16

engaged in infidelity. (Accord, *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128, disapproved on other grounds by *People v. Burgos* (2024) 16 Cal.5th 1, 31.)

Defendant maintains it prejudiced him that the prosecutor mentioned his girlfriends in her closing arguments. The sole mention by the prosecutor initially was in the context of raising the inconsistency of defendant's statements to the police investigator; she pointed out initially he said G.M. only showed him her body, then stated G.M. touched him: "And then, he also had said, 'One time, she did touch me. For me to make a move on her was exactly what she wanted. I know that she wanted it with me, and I never wanted that. Her dad told her I had several women, and how did I make love, and how many times I made love to them.'" The prosecutor went on to ask the jurors to "use your common sense and your life experience because that's absolutely not how this went down"; that it did not make sense that G.M. "came on" to defendant. In her rebuttal closing, the prosecutor addressed defense counsel's arguments that the case boiled down to what G.M. said versus what defendant said. She argued defendant admitted to the officer "that he is fully capable of lying, of carrying something on. And so, when you're looking at who to believe, keep that in mind." The prosecutor did not unduly emphasize defendant's claim that he had other lovers or suggest the jury should use the information improperly, and the references were of limited duration in the context of the entire closing. We disagree with defendant's assertion that the references carried "great weight" so as to affect the outcome.

Further, the court instructed the jury extensively concerning character evidence and the prosecutor's questions: "You have heard testimony that the defendant is non-sexually deviant with children. [¶] Evidence of the

17

defendant's character for being non-sexually deviant with children can by itself create a reasonable doubt whether the defendant committed the sexual offenses alleged in this case; however, evidence of the defendant's character for being non-sexually deviant with children may be countered by other evidence of his character for the same trait. You must decide the meaning and importance of the character evidence. [¶] If the defendant's character for certain traits has not been discussed among those who know him, you may assume that his character for those traits is good. [¶] You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt. [¶] The attorney for the People was allowed to ask defendant's character witnesses if they had heard that the defendant had engaged in certain conduct. These 'have you heard' questions and their answers are not evidence that the defendant engaged in any such conduct. You may consider these questions and answers only to evaluate the meaning and importance of a character witness's testimony." We presume the jury understood and complied with these instructions (*People v. Alvarez* (2025) 18 Cal.5th 387, 458; *People v. Erskine* (2019) 7 Cal.5th 279, 301) so as not to use the evidence for an improper purpose. And, as stated, the mixed verdict in this case demonstrates the jury was not prejudiced by the challenged impeachment evidence.

Nor was defendant prejudiced by the questions asked of G.R. that assertedly suggested his infidelity. Questions of counsel (or inferences drawn from those questions) are not evidence, and the court instructed the jury accordingly: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the

18

witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." Again, we presume the jury understood and complied with that instruction. (*People v. Alvarez, supra*, 18 Cal.5th at p.458.)

Ultimately, we conclude the adult relationship/affair evidence that defendant complains of played only a very minor role in the context of the evidence establishing defendant's guilt. Accordingly, any purported error was harmless under either standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [constitutional error]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [state law error].)

## II. *Admission of CSAAS Evidence*

Defendant contends the trial court abused its discretion in admitting Ward's testimony on CSAAS. He maintains the theory behind CSAAS is no longer necessary because the public has a "very real understanding about child molest cases" given the "tidal wave of child sexual abuse allegations and revelations" in various modern contexts, such as the Catholic church or college football. He also argues the evidence was unnecessary because his counsel stated he did not intend to attack G.M.'s credibility on the basis of delayed disclosure, nor did he claim she could have done something to protect herself from being molested. Characterizing the evidence as easily misconstrued and "inherently unreliable" because it is just as consistent with false testimony, defendant argues "[t]here is no place in a criminal trial for an unscientific and prejudicial 'syndrome' that rebuts misconceptions that no longer exist." Defendant further contends CSAAS testimony cannot be limited to an assertedly proper purpose of dispelling myths around child sexual abuse, but always suggests the alleged victim was abused, even

19

though courts hold such evidence cannot be used to prove the abuse occurred. He points to a Ninth Circuit case observing that CSAAS is an "impermissible way of bolstering the credibility of a child witness," as well as out-of-state authorities expressing problems with CSAAS expert testimony. According to defendant, "Ward's testimony encouraged the jurors to make a logical fallacy: (1) Children who are abused by a family member often delay reporting; (2) abuse can happen when people are around, but they actually do not witness the abuse so it happens in secret; (3) children often don't fight back because they are smaller; therefore (4) G.M. was abused."

A. *Legal Principles*

" 'Except as otherwise provided by statute, all relevant evidence is admissible.' [Citation.] Relevant evidence is that which has 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Lamb* (2024) 16 Cal.5th 400, 423, quoting Evid. Code, §§ 210, 351; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 170-171.) Expert testimony, like all evidence, must be relevant. (Evid. Code, § 350; *People v. McAlpin, supra*, 53 Cal.3d at p. 1303.) Evidence tending to show a sex abuse victim's credibility can become relevant where a defendant puts the victim's credibility at issue. (See *People v. Flores, supra*, 101 Cal.App.5th at pp. 457-458; *Lapenias*, at p. 171.) As with other evidentiary rulings, the trial court is vested with " 'wide discretion in determining relevance' " (*McAlpin*, at p. 1303), and its decision "to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*Id.* at p. 1299.)

As to CSAAS expert testimony specifically, this court has recently observed: " '[I]t has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is

20

admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse.' " [Citation.] When a victim's credibility is placed at issue due to 'paradoxical behavior, including a delay in reporting,' CSAAS testimony is admissible to disabuse a jury of misconceptions about how a child reacts to molestation." (*People v. Flores*, *supra*, 101 Cal.App.5th at pp. 455-456; see also *id*. at p. 458 ["the defense placed the victims' credibility at issue using precisely the kind of 'paradoxical' behaviors, including delayed reporting, helplessness, and memory repression, that CSAAS testimony is admissible to address"]; accord, *People v. McAlpin, supra*, 53 Cal.3d at pp. 1300-1301 [the "great majority of courts" approve of admitting expert CSAAS testimony "to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior"]; *People v. Sedano* (2023) 88 Cal.App.5th 474, 479 [such expert testimony has "long been held admissible in California" including to rehabilitate a victim's credibility when the defendant suggests that their conduct afterwards is inconsistent with testimony claiming molestation]; *People v. Lapenias, supra*, 67 Cal.App.5th at p. 171 ["CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse"]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 ["CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"]; but see *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64-65 [holding CSAAS evidence irrelevant, and counsel prejudicially ineffective for failing to object to it, where (1) it was undisputed the defendant in the 1980's committed sex offenses against certain victims, there was no testimony those victims delayed reporting or recanted, and the defendant did not question

21

their credibility at trial; and (2) the prosecutor used CSAAS to infer other individuals were victims of the underlying charged crimes, even though two of those individuals denied they were touched inappropriately and their parents, who were mandatory reporters, denied seeing anything troubling].)

B. *Analysis*

We are unpersuaded by defendant's various challenges to the court's decision to admit Ward's testimony about CSAAS. As reflected by defense counsel's questioning of G.M., the main theme of defendant's case was to challenge G.M.'s veracity. Indeed, in his opening brief, defendant admits that G.M.'s "credibility was the central issue." Defense counsel attacked her credibility in part by pointing to the lapse in time between the abuse and G.M.'s reporting. Based on the defense case broadly, the CSAAS evidence was helpful to the jury in assessing the critical issue of G.M.'s truthfulness, to explain those delays in sex abuse victims generally and their paradoxical behavior toward their abuser.

On defendant's more specific points, the *McAlpin* court emphasized that a jury need not be entirely unfamiliar with a subject of an expert's opinion to warrant its admission. (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300.) Thus, the fact that modern events may impart some general understanding about sex abuse victims' behavior does not make expert CSAAS testimony irrelevant and inadmissible.

Further, though defendant asserts his counsel advised the trial court he did not intend to challenge G.M.'s credibility based on her delayed

disclosure, we read counsel's statement below as equivocal.[7] And as summarized above, defense counsel focused questioning on the passage of time from the abuse and G.M.'s reporting, contradicting any purported limitation in that respect. Finally, other evidence, namely defendant's interview with the Riverside Sheriff's Department officer investigating G.M.'s allegations, suggested that G.M.'s delay in reporting was reason to disbelieve her. In short, the trial court did not abuse its broad discretion in permitting the prosecution to present Ward as a CSAAS expert to explain the sorts of behaviors sexual abuse victims exhibit.

Defendant's reliance on out-of-state authorities that assertedly reject CSAAS expert testimony does not convince us to change our conclusion. Such authorities do not bind us. We rely on *People v. McAlpin, supra*, 53 Cal.3d 1301 and the many cases from other courts, including this one, that approve of the testimony. (Accord, *People v. Munch* (2020) 52 Cal.App.5th 464, 468 [*McAlpin* is "binding on all lower courts in this state"].) "That other jurisdictions may disagree with [*McAlpin*] does not change its impact on California cases." (*Ibid.*)

Finally, we disagree that Ward's testimony encouraged jurors to engage in the fallacy defendant describes. She testified that CSAAS was not a diagnostic tool, "meaning that it cannot be used to diagnose or determine whether or not sexual abuse occurred." She emphasized that "no behavior after the fact can be taken and used to look back and determine whether

---

7 During pretrial evidentiary motions, defense counsel argued the expert CSAAS testimony was not necessary to dispel myths and misconceptions prevalent in the 1980's, then stated: "I certainly will not be arguing anything to the effect of, had this happened, [G.M.] would have come forward right then and there and disclosed. I think there's room for argument about the timing of her disclosures and things of that nature, but nothing that falls under a myth or a misconception."

23

sexual abuse occurred because these behaviors can be caused by other causes. But if we do know that a child has been sexually abused, then understanding these behaviors are helpful in essentially just understanding why children do what they do in response to sexual abuse." The trial court instructed the jury with CALCRIM No. 1193, which as more fully set out below explained that Dr. Ward's testimony was "not evidence that the defendant committed any of the crimes charged against him[,]" and stated that the jury could "consider this evidence only in deciding whether or not G.M.'s conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." Under these circumstances, "a reasonable jury 'would understand it cannot use [CSAAS] testimony to conclude [the victim] was, in fact, molested.'" (*People v. Flores*, *supra*, 101 Cal.App.5th at p. 459, quoting *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.) For the foregoing reasons, we conclude Ward's testimony did not violate defendant's due process rights. (See *People v. Lapenias, supra*, 67 Cal.App.5th at p. 174 [admission of CSAAS evidence in compliance with rules of evidence does not violate due process]; *People v. Patino, supra*, 26 Cal.App.4th at p. 1747 ["introduction of CSAAS testimony does not by itself deny appellant due process"].)

### III. *Instruction with CALCRIM No. 1193*

As stated, the trial court instructed the jury with CALCRIM No. 1193: "You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. [¶] Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] Dr. Jody Ward's testimony about child sexual abuse accommodation syndrome is

24

not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not G.M.'s conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." Defense counsel did not object to the instruction, either when it was proposed and the court indicated it would be given or when the court read it to the jury.

Defendant contends the court prejudicially erred by so instructing the jury because CALCRIM No. 1193 does not comply with *People v. Housley* (1992) 6 Cal.App.4th 947, which he says requires that the jury be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true.[8] According to defendant, the instruction violated *Housley* because it told jurors CSAAS evidence may be used to determine whether G.M. was telling the truth, effectively allowing them to improperly use it to decide

---

[8]    Defendant also contends, citing *Housley*, *supra*, 6 Cal.App.4th at pages 958-959, that the court has a "sua sponte duty to correctly instruct the jury on the proper use of CSAAS testimony." *Housley* held that trial courts are "obligated to give sua sponte instructions regarding the 'general principles of law relevant to the issues raised by the evidence' " (*id*. at p. 957), and under those principles, given the potential for misuse of CSAAS evidence and the potential for prejudice, trial courts have a "duty to render a sua sponte instruction limiting the use of such evidence." (*Id*. at pp. 958-959.) The court in *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1073, pointed out that this holding of *Housley* is inconsistent with "statutory and decisional law" (*id*. at p. 1074), including *People v. Humphrey* (1996) 13 Cal.4th 1073. As *Mateo* correctly points out, this court has more recently held that the limiting instruction must be given *if requested*. (*Mateo*, at p. 1073.) The court here gave the instruction, so we need not address the point further.

whether he was guilty, and allowed the jurors to use CSAAS to find that G.M.'s behavior "was consistent" with having been abused.

The People respond that defendant forfeited the claim by failing to object to the instruction. They argue it is a correct statement of the law in any event. We need not decide the forfeiture question. Reaching the merits, we conclude the court did not err by giving CALCRIM No. 1193 to the jury.

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326; see also *People v. Lemcke* (2021) 11 Cal.5th 644, 655; *People v. Page* (2025) 114 Cal.App.5th 1022, 1029; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815-816.)

Faced with similar claims that defendant makes here, this court in *People v. Page*, *supra*, 114 Cal.App.5th 1022 recently upheld the instruction as an accurate instruction on the limited use of CSAAS evidence. (*Id*. at p. 1032.) Other appellate courts considering challenges to a former, slightly different version, of CALCRIM No. 1193[9] have upheld it as a correct statement of the law and the limitations on the use of CSAAS testimony. (See, e.g., *People v. Lapenias, supra*, 67 Cal.App.5th at p. 175.) *Lapenias* observed that courts have held the instruction "does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b)

---

[9]     CALCRIM No. 1193 formerly used a double negative. In September 2022, before defendant's 2023 trial, that language was eliminated in the sentence: "You may consider this evidence only in deciding whether or not [the victim's] conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of [his or her] testimony." (Judicial Council of Cal. Criminal Jury Instructions (Sept. 2022 supp.) pp. iii, 62-63.)

violate due process; or (c) misapply the burden of proof." (*Ibid.*, citing *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 & *People v. Munch, supra*, 52 Cal.App.5th at pp. 473-474; see also *People v. Ramirez* (2023) 98 Cal.App.5th 175, 188, 219-220; *People v. Flores, supra*, 101 Cal.App.5th at pp. 458-459 [holding CALCRIM No. 1193 mitigates prejudice from CSAAS evidence].)

Defendant first focuses on the instruction's language that the jury may use CSAAS testimony to evaluate the believability of G.M.'s testimony. He argues: "[U]sing CSAAS evidence to evaluate whether the victim's testimony is believable (which CALCRIM No. 1193 allows) and using it to evaluate whether the victim's claims are true (which *Housley* prohibits), is a distinction without a difference." He argues *People v. Gonzales, supra*, 16 Cal.App.5th 494 and *People v. Munch, supra*, 52 Cal.App.5th 464 were wrongly decided to the extent they reject this same argument. He maintains the reasoning of these cases—that a jury can use CSAAS to conclude a victim did not lie—unavoidably allows the jury to consider CSAAS evidence to conclude the victim thus told the truth, and to prove guilt.

We rejected such a claim in *People v. Page, supra*, 114 Cal.App.5th 1022, agreeing with *Gonzales* and cases following it. *Gonzales* involved testimony from the same CSAAS expert who testified in this case, Dr. Ward. (*People v. Gonzales, supra*, 16 Cal.App.5th at p. 499.) There, the court expressly addressed the defendant's claim that the instruction was "inconsistent" in that it "states that the CSAAS testimony is not evidence the defendant committed the charged crimes, and also that the jury may use the evidence in evaluating the believability of [the victim's] testimony." (*Gonzales*, at p. 503.) *Gonzales* rejected the argument that it was "impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that Gonzales committed the charged

27

crimes." (*Ibid*.) The court reasoned the instruction "must be understood in the context of Ward's testimony. Ward testified that CSAAS is not a tool to help diagnose whether a child has actually been abused. She said that if it is not known whether a child has been abused, CSAAS is not helpful in determining whether a child has, in fact, been abused. The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use Ward's testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes Ward's testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Gonzales*, at pp. 503-504.) Dr. Ward testified similarly here. As we did in *Page*, we decline to hold *Gonzales* was wrongly decided. (*People v. Page*, *supra*, 114 Cal.App.5th at p. 1130.)

Defendant next complains of the instruction's use of the phrase "consistent with the conduct of someone who has been molested." According to him, this "directly conflicts with decades of case law holding that CSAAS must never be used as evidence that the complaining witness's behavior was consistent with the behavior of an abused child. Rather, CSAAS testimony has been strictly limited to providing evidence that the victim's behavior was not necessarily inconsistent with that of an abused child." He points to numerous decisions holding CSAAS is admissible only for these purposes,

and tells us he has not found any case holding it is admissible to prove the victim's behavior was *consistent with* an abused child's behavior. That, he argues, invites the jurors to reach a "predictive conclusion" about his guilt.

Again, as we did in *Page*, we reject the contention. (*People v. Page*, *supra*, 114 Cal.App.5th at p. 1030.) "An instruction that the jury may consider CSAAS evidence to decide whether or not the alleged victim's conduct was 'consistent with' that of a child who has been sexually abused does not permit any use of the evidence not also permitted by an instruction that the jury may consider the evidence to decide whether or not such conduct was 'not inconsistent with' that of a sexually abused child. The quoted phrases have the same meaning. [Citations.] Whichever phrase is used, 'the last sentence of the instruction contains a direction with specific and general aspects. Specifically, the jury is to use the expert testimony to help ground its analysis of the consistency of the complaining witness's conduct (by using a more informed reference point). The jury is then to use this "consistency" analysis in its general evaluation of the believability of the complaining witness's testimony . . . . Reasonable jurors would not understand the instruction to mean that if they find the characteristics of [CSAAS] to be satisfied, this indicates that [the complaining witness] was necessarily telling the truth.' " (*Ibid*.) Both the former and current versions of CALCRIM No. 1193 correctly instruct the jury on the proper use of CSAAS evidence, and how it may not be used.

Viewing CALCRIM No. 1193 in context with the other instructions, we conclude it did not create an impermissible or prejudicial inference of guilt. The court instructed that the jurors "alone must judge the credibility or believability of the witnesses," and they may believe "all, part, or none of any witness's testimony." They were instructed that they were not required to

accept expert testimony as true or correct.  The instructions as a whole gave the jury the option to disbelieve G.M. as well as Dr. Ward regardless of the CSAAS evidence.  We presume the jury followed them.

In sum, the trial court did not err or violate defendant's constitutional rights by instructing the jury with CALCRIM No. 1193.  Having found no error in the instruction, we do not reach prejudice.  (*People v. Page*, *supra*, 114 Cal.App.5th at p. 1033.)

DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

I CONCUR:


IRION, J.

30

Rubin, J., concurring.

I join the majority's opinion except with respect to the challenge leveled at CALCRIM No. 1193. I write separately to express disagreement with the new version of that instruction. Specifically, changing the double negative ("not inconsistent with") into a positive phrase ("consistent with"), changed the instruction's meaning in important ways that can mislead jurors.

CALCRIM No. 1193 is a limiting instruction for Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175.) The instruction tells jurors to use CSAAS testimony only to evaluate a child's credibility, not as evidence the defendant committed any charged crimes.

CSAAS evidence is a response to implicit or explicit impeachment of a child witness. The basis of CALCRIM No. 1193 is the seminal case from this division, *People v. Bowker* (1988) 203 Cal.App.3d 385. In *Bowker* we articulated how "to provide the jury with relevant, accurate information regarding 'recent findings of professional research on the subject of a victim's reaction to [child abuse].' " (*Id*. at p. 393.) We held that where evidence of a child's behavior is used to suggest the conduct is inconsistent with being molested, CSAAS testimony may be " 'introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject's reaction' " to molest. (*Id*. at p. 392.) "The evidence is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are *not inconsistent* with having been molested." (*Id*. at p. 394, original italics omitted, italics added.)

The point of placing CSAAS testimony before jurors is to disabuse them of commonly held misconceptions about how children react to sexual assault. These misconceptions include behaviors commonly referred to as

"self-impeaching" conduct (e.g.: delayed disclosure, no disclosure, incomplete disclosure). (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.) This impeaching conduct is used to undermine a child's credibility. If CSAAS evidence is properly admitted the question to the jury is whether a child's behavior is indeed impeaching, or *inconsistent*, with being molested.

But by changing the wording from *Bowker*, "that the victim's reactions as demonstrated by the evidence are *not inconsistent* with having been molested," (*Bowker, supra*, 203 Cal.App.3d at p. 394, italics added) CALCRIM No. 1193 distances itself from its roots as a tool to address inconsistency and rebut impeachment. Worse, it can easily be misused by both jurors and lawyers.[1]

As my colleague explained in her concurring opinion in *People v. Page*, (2025) 114 Cal.App.5th 1022 at page 1036 (conc. opn. of Kelety, J.) "although the difference between 'consistent' and 'not inconsistent' may be subtle, the prior term ('not inconsistent with') helped explain that victims sometimes report abuse in ways that do not match up with the expectations a lay person might have, and that such anomalies in reporting do not necessarily mean that the victim was not abused. [Citation.] The current 'consistent with' phrasing does not have the same meaning and inadequately conveys the intent of the instruction. Stating that reporting anomalies 'are consistent with' abuse could be understood by a jury to mean that reporting anomalies indicate that the abuse *in fact occurred*."

Nonetheless, viewing CALCRIM No. 1193 in the context of the facts presented in this case, the other instructions given the jury, and Dr. Ward's

---

[1] On the other hand, CALJIC No. 10.64 remains true to *Bowker* and its progeny and I believe provides a clear, understandable statement of the law in this area.

testimony regarding the limitations of CSAAS, any error in CALCRIM No. 1193 was harmless.  I therefore agree that the judgment should be affirmed.

RUBIN, J., Concurring